Exhibit A

HUNT Since 1911 ERA REAL ESTATE

# CONTRACT TO PURCHASE
# CENTRAL NEW YORK INFORMATION SERVICE, INC.

**THIS IS A CONTRACT FOR THE PURCHASE AND SALE OF REAL ESTATE. WHEN SIGNED, THIS DOCUMENT BECOMES A BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, BUYER AND SELLER SHOULD SEEK THE ADVICE OF AN ATTORNEY.**

**MLS#** S1696846 **. Buyer acknowledges that the information contained in the Multiple Listing Service ("MLS") is not guaranteed. Information contained in the MLS should be independently verified prior to the execution of the contract. The Greater Syracuse Association of REALTORS®, Inc. and the Central New York Information Service, Inc. are not responsible for the information contained in the MLS.**

**Compensation is not set by law or any REALTOR® Association or MLS and that compensation to BROKER is fully negotiable.**

**CONTRACT TO PURCHASE** made as of the 12th day of July 2026

**BETWEEN:**

Buyer(s): Derek John Caramella Elexis Elizabeth Medora Caramella
Buyer(s) Address : 6129 Ridgecrest Dr Cicero NY 13212 (Hereinafter called "Buyer"),
Seller(s): Joseph Dimino
Seller(s) Address: 4815 Lepinske Farm Pl Clay, NY 13041 (Hereinafter called "Seller").

The Parties agree as follows:

1. **PREMISES.** Seller shall sell and convey and Buyer shall purchase the real property, including all buildings, improvements and appurtenances thereto (collectively, the "Premises") known as (mailing address) 4815 Lepinske Farm Place Clay NY 13041 in the town of Clay County of Onondaga State of New York, being a Single-Family Residence identified by Tax Map # 312489-063-000-0005-006-000-0000 . This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises including all plumbing, heating, lighting, bathroom and kitchen cabinets, mantels, doors, garage door openers and respective remotes, venetian blinds, shades, screens, curtain rods, awnings, storm windows, storm and screen doors, window boxes, mailbox, TV aerials, weather vanes, pumps, shrubbery, fencing, electronic fencing and transmitter and receiver, tool shed, built-in dishwasher, garbage disposal unit, built-in range and/or oven, built-in air conditioning equipment and installations, wall to wall carpeting and all other fixtures and fittings belonging to or used in the operation of the Premises and owned by Seller, and
   Appliances to Convey per MLS: Cooktop - Gas, Dishwasher, Disposal, Microwave, Oven/Range Freestanding, Oven/Range Gas, Range Hood-Exhaust Fan, Refrigerator, Living Room Couch

   Excluded from this sale are any of the following items that may be on the Premises: furniture, household furnishings, rented water softeners, air conditioning units installed in windows, and

2. **PURCHASE PRICE**
   Buyer agrees to pay Seller Five Hundred Eighty Thousand ($ 580,000 ) for the Premises, payable as follows:
   **Deposit:**
   $ 5,000 in the form of a ACH to be held by Hunt Real Estate, ERA until this contract is signed by Seller, at which time it shall become part of the Purchase Price and shall be deposited in a non-interest bearing account at M&T Bank or returned to the Buyer if this contract is not accepted. Seller directs and authorizes the holder of the Deposit to return it to Buyer in the event of a bona fide failure of any contingency in this Contract, after deducting therefrom and paying to Seller sums payable to Seller pursuant to Section 2 "Financing".
   **Cash Balance**:
   $ 35,000 cash on Closing (transfer of title). If Seller is a "foreign person" as defined in the Foreign Investment in Real Property Tax Act, Section 1445 of the Internal Revenue Code, as amended, and the Purchase Price exceeds $300,000.00, Buyer shall withhold from the sums due Seller at Closing, any amounts mandated by Section 1445, as amended, or by any other federal, state or local statute, rule or regulation concerning the sale of real property by nonresidents of the United States of America.

Initial here: Buyer(s) DJC / EEM Seller(s) JD /



This form was prepared by Amanda Stiles using the INSTANET FORMS internet contract management service.

☒ **Financing:**
$ 540,000 balance by Buyer obtaining, at Buyer's cost and expense, a conventional mortgage loan for a term of not less than 30 years. Buyer shall make good faith application for this mortgage within 10 days of the acceptance of this Contract. Buyer shall provide Seller with evidence of written approval of this mortgage, or reasonably satisfactory proof of financial ability to close, by 8/12/2026 (the "Mortgage Commitment Deadline") or Seller may cancel this Contract at Seller's option by Notice as provided for herein. Buyer authorizes the Lending Institution or Mortgage Banker or Broker to provide a copy of written mortgage commitment with pre-closing conditions to the listing agent and selling agent as set forth in this contract. If following a good faith application by Buyer, this mortgage cannot be obtained for reasons other than appraised value of the Premises as evidenced by a denial letter from a lender which regularly makes residential mortgage loans in the county where the Premises are located, this Contract may be terminated by either party and the Deposit returned to the Buyer, less the actual costs incurred by Seller in updating the Abstract of Title, survey and obtaining tax searches, not to exceed $1,500.00, which costs shall be deducted from the Deposit.

☐ **Mortgage Expenses:**
Buyer agrees to pay all sums required by Buyer's lending institution. At closing, Seller agrees to credit Buyer $ _____________ toward actual Seller's Concessions (including only: loan origination or discount fees, mortgage application fee, mortgage tax, deed and mortgage recording fees, mortgage title insurance premium, appraisal fee, credit report and lender's attorney's fee, pre-payables and escrow) incurred by Buyer in this transaction.

☐ **Assumption:** $ _______________ balance by Buyer assuming and agreeing to pay an existing mortgage held by _________________________________with an approximate balance of said amount, payable monthly in the sum of $_____________ (which includes principal, interest at _______%, taxes, and all insurance.) Buyer agrees to reimburse Seller for any existing escrow account. Seller ☐ **will** ☐ **will not** be released from liability thereunder. ☐ **Seller** ☐ **Buyer** shall pay all expenses charged by the holder of the existing mortgage in connection with the release of Seller from liability and/or the assumption of the mortgage by Buyer.

☐ **Purchase Money Mortgage:** The Buyer shall deliver a purchase money bond and ____________________ mortgage to the Seller at closing. This purchase money bond and mortgage shall be in the amount of $____________________, shall be for a term of ______ years, shall bear interest at the rate of _________% per year, and shall be paid in monthly installments of principal and interest in the amount of $ _________________. Principal balance shall be all due and payable _______ years from the date of closing. The formal purchase money bond and mortgage documents shall be drawn by Seller's attorney and approved by Buyer's attorney. The mortgage shall include a clause that it is assumable only with the consent of the Seller and there shall be no penalty for prepayment of all or part of the unpaid balance of the note.

☐ **Credit Report- Financial Ability:** This contract is accepted by the Seller on the condition that Buyer furnish to Seller (1) a written credit report satisfactorily to Seller from an accredited credit reporting bureau at Buyer's expense, and (2) sufficient evidence to support Buyer's financial ability to make proposed mortgage payments (i.e., verification of employment, income tax returns, etc.). If Seller is not satisfied with Buyer's credit standing or with Buyer's financial ability to repay the mortgage, Seller may terminate this contract by giving Notice to the Buyer within ______ days after receipt of said credit report and evidence of financial ability and Buyer's deposit shall be returned.

3. **ACCEPTABLE FUNDS.** All money payable at closing under this Contract, unless otherwise specified, shall be paid in US funds by:
(a) Cash, but not over $500.00;
(b) Good certified check of Buyer drawn on, or official check issued by any bank, credit union (provided such check is drawn on a New York State bank), or savings and loan association having a banking office in the State of New York, payable to or endorsed by an original payee to the order of Seller, or as Seller may otherwise direct upon not less than 3 business days notice to Buyer;
(c) Uncertified check of Buyer up to the amount of $1,000.00; or
(d) As otherwise agreed to in writing by Seller or Seller's attorney.

**IMPORTANT NOTICE:** Never trust wiring instructions sent via email. Cyber criminals are hacking email accounts and sending emails with fake wiring instructions. These emails are convincing and sophisticated. Always independently confirm wiring instructions in person or via a telephone call to a trusted and verified phone number. Never wire money without double-checking that the wiring instructions are correct.

Initial here: Buyer(s) DJC / EEM Seller(s) JD / __________



This form was prepared by Amanda Stiles using the INSTANET FORMS internet contract management service.

**4. REAL ESTATE BROKERAGE FEE.**

**Listing Broker** Skinner & Assoc. Realty LLC.

**Cooperating or Selling Broker** Hunt Real Estate, ERA.

**Seller** shall pay Listing Broker per listing agreement *or* ______ % of Purchase Price *or* $__________ (filled out by Listing Broker).

**Seller** shall pay Cooperating or Selling Broker __3__ % of Purchase Price *or* $____________ (filled out by Cooperating or Selling Broker).

**Buyer** shall pay Listing Broker _______ % of Purchase Price *or* $______________.

**Buyer** shall pay Cooperating or Selling Broker ________ % of Purchase Price *or* $_______________.

☐ Check here if Buyer or Seller is paying any additional compensation to any of the Brokers in this transaction and is not disclosed in this section.

The Deposit shall be applied towards the payment of the compensation

5. **SELLER'S REPRESENTATIONS.** Seller represents and warrants to Buyer that: (i) the personal property described in Section 1 is or at Closing will be paid for and owned by Seller free and clear of all liens and encumbrances; (ii) all plumbing (including septic systems, wells, and water pumps, if any), heating, air conditioning, electrical and mechanical systems and appliances will be in working order at the time of closing; (iii) Seller has the exclusive right, power and authority to sell, convey and transfer the Premises in accordance with the terms of this Contract; and (iv) at the time of closing, the Premises shall be free of containers of hazardous substances (as those terms are defined under any federal, state, or local laws, rules or regulations pertaining to environmental regulations, contamination or cleanup): paints; household cleaning products; gasoline and used oil.

6. **TITLE DOCUMENTS.** Seller shall deliver to Buyer no later than thirty (30) days from the contract date an up-to-date Abstract of Title prepared by a title or abstract company authorized to do business in this State (and made in accordance with Onondaga County Bar Association Standards, if the property is within Onondaga County), made from the records of the County Clerk's Office and commencing with a Warranty Deed conveying a 100% fee interest and recorded no later than 40 years prior to the date of the Contract. If the property is in Onondaga County, the Abstract of Title shall also certify to all easements, covenants and restrictions affecting the property recorded in 1945 or thereafter. Seller shall also provide a Tax Search covering County, City or other taxes for the applicable lien period, current property tax receipts and proof of payment of common charges, if any.

   Seller shall also provide an up-to-date instrument survey showing all structures and improvements upon the property. Said survey will show all courses and distances based on the deed of record and be tied into a fixed point, such as a road intersection or a tract line where applicable, and be certified to the Buyer, its lender and the title company.

   If the Premises is a condominium unit, in lieu of the above, Seller shall provide and deliver to buyer a copy of the existing Owner's or Mortgagee policy, if any, and stub search from date of policy, together with tax searches and tax receipts as hereinabove set forth.

   In the event this Contract is terminated, the title documents shall be promptly returned to Seller or Seller's attorney by Buyer or Buyer's attorney. This provision shall survive the termination of the Contract

7. **MARKETABLE TITLE.** At Closing, Seller shall transfer to Buyer good and marketable title to the Premises, subject to building and use restrictions of record and governmental laws, regulations and/or ordinances (provided that the same are not violated), utility and/or drainage easements benefiting the Premises or permitted pursuant to FNMA/FHLMC title standards and taxes for local improvements not then due. Otherwise such title shall be free and clear from the rights of others unless set forth herein. Buyer has been advised that the Premises is, or may lie, in lands claimed by a Native American group and that fact shall not be raised as a defect in title.

8. **CLOSING.** The passing of title ("Closing") shall be held at the office of Buyer's lending institution or its attorney (or if none, at the office of the Seller's attorney) or as otherwise agreed, **on or about** ~~10/12/2026~~ JD 10/21/2026 DJC EEM.



This form was prepared by Amanda Stiles using the INSTANET FORMS internet contract management service.

9. **CLOSING DOCUMENTS.** At the time of Closing, Seller shall execute and deliver to Buyer a Warranty Deed with lien covenant together with such other documents as may be required by law or reasonably requested by Buyer's attorney or lending institution.

10. **ADJUSTMENTS.** Prepaid or unpaid charges including but not limited to rents and security deposits, taxes, water and common charges, garbage removal fees and fuel oil and propane shall be prorated and adjusted as of 11:59 pm the day before Closing or 11:59 at the end of the last day of possession by Seller, whichever is later. Fuel oil and propane in storage shall be adjusted at the average market price at the time of Closing.

11. **RECORDING EXPENSES.** Buyer shall pay the applicable mortgage tax and deed and mortgage recording fees. Seller shall pay for the recording fees for any mortgage discharge, gains tax affidavit, and any title affidavit required, as well as the transfer tax, and any real property gains tax applicable to the transaction. For residential real property, the Buyer shall pay a tax of 1% of the purchase price if the purchase price is $1 million or more.

12. **PRE-CLOSING INSPECTION.** Buyer and their authorized agents shall have the right, at a reasonable time and upon reasonable notice to Seller, to inspect the Premises before closing. The purpose of this inspection is to establish that the Premises is in the same condition as it was as of the date of the Contract, subject to reasonable wear and tear, and that work required pursuant to the Contract, if any, has been completed. At the time of the pre-closing inspection Seller shall have all utilities in service that are required for the operation of heating, air conditioning, plumbing, security and electrical systems, unless otherwise agreed upon and provide working smoke and carbon monoxide detectors.

13. **POSSESSION.** Unless otherwise agreed upon, possession of the Premises shall be delivered at closing. At the time of possession, the Premises shall be in broom clean condition, vacant with the exception of agreed upon tenants, free of debris and all personal property not included in the sale. At Closing, Seller shall deliver to Buyer all garage door openers, keys for the Premises, and provide security codes for any security systems. Until Closing, Seller shall perform ordinary lawn and landscape maintenance and snow removal.

14. **ASSIGNMENT.** This Contract may not be assigned by Buyer without Seller's written consent.

15. **RISK OF LOSS.** The risk of loss or damage to the Premises by fire or other causes shall remain with Seller until Closing.

16. **MISCELLANEOUS.**
    a. If Closing occurs during a tax year before a new tax rate is fixed, the apportionment of taxes shall be based upon the tax rate for the immediately preceding fiscal year applied to the latest assessed valuation.
    b. Until delivery of possession, Seller shall be responsible for any damage to the Premises and any water and utility services.
    c. Any errors or omissions in computation at Closing shall be corrected upon discovery.
    d. Only the representations contained in Section 5(i) and the provisions contained in Sections 16(b) and 16(c) shall survive the Closing and transfer of title.
    e. If Buyer's lender require repairs to the Premises, it is agreed that Seller shall pay __0__% of said repairs and Buyer shall pay __100__% of said repairs. If the cost of the repairs exceeds $__1500__ then __buyer__ may terminate this Contract and the Deposit shall be returned to Buyer, unless the other party agrees to pay the excess. Any reinspection fee shall be paid by ☐ **Seller** ☒ **Buyer** ☐ **Split evenly by Seller and Buyer.**
    f. Pest inspection, if lender required, shall be paid by ☐ **Seller** ☒ **Buyer** ☐ **Split evenly by Seller and Buyer.**

17. **NEW YORK STATE AGRICULTURAL AND MARKET LAW** Section 310:
"It is the policy of this state and this community to conserve, protect and encourage the development and improvement of agricultural land for the production of food, and other products, and also for its natural and ecological value. This disclosure notice is to inform prospective residents that the property they are about to acquire lies partially or wholly within an agricultural district and that farming activities occur within the district. Such farming activities may include, but not be limited to, activities that cause noise, dust and odors. Prospective residents are also informed that the location of property within an agricultural district may impact the ability to access water and/or sewer services for such property under certain circumstances. Prospective purchasers are urged to contact the New York State Department of Agriculture and Markets to obtain additional information or clarification regarding their rights and obligations under article 25-AA of the Agriculture and Markets Law."
Premises ☐ are ☒ are not located partially or wholly within an agricultural district.

Initial here: Buyer(s) __DJC__ / __EEM__ Seller(s) __JD__ / ______



This form was prepared by Amanda Stiles using the INSTANET FORMS internet contract management service.

18. **LEAD BASED PAINT CONTINGENCY ADDENDUM AND DISCLOSURE.** If the Premises was constructed prior to 1978, Buyer and Seller must complete and sign the Lead Based Paint Contingency Addendum and Disclosure Form, or this contract will not be binding.

19. **NEW YORK STATE REAL PROPERTY LAW** Section 242:
The above property ☒ does □ does not have utility electric service available to it. This property □ is ☒ is not subject to an electrical and/or gas utility surcharge. This type of surcharge is: ________________. The purpose of the surcharge is ________________. The amount of the surcharge is $ _____________. The surcharge is payable:
□ Monthly, □ Annually, □ other basis ________________.
The above property □ does ☒ does not have uncapped natural gas wells.

20. **SELLER'S PROPERTY CONDITION DISCLOSURE.** Except as provided in Section 463 of the Real Property Law, Seller shall deliver a signed Property Condition Disclosure Statement to the Buyer or Buyers Agent prior to the signing by the Buyer of a binding contract of sale.

21. □ **A. HOME INSPECTION.** This Contract is contingent upon the Buyer obtaining, at Buyer's expense, a satisfactory Home Inspection by a New York State Licensed Home Inspector, Architect or Engineer within _____ calendar days of the last of the Buyer and Seller to accept the Contract ("Inspection Approval Period"). This contingency shall be deemed waived unless Notice that the Home Inspection is unsatisfactory is received within the "Inspection Approval Period". If the Home Inspection is deemed unsatisfactory, Buyer and Seller have ____ calendar days to reach an acceptable agreement. Failure to do so terminates the contract. If the Contract is deemed terminated, the deposit shall be returned to the Buyer. At the time of the home inspection Seller shall have all utilities in service that are required for the operation of heating, air conditioning, plumbing, security and electrical systems, unless otherwise agreed upon. The Buyer will supply to the Seller, if requested, a copy of the Home Inspection Report.

☒ **B. HOME INSPECTION WAIVED.** Buyer(s) Initial: DJC / EEM The Buyer has been informed that it is in its best interest to make the Contract contingent upon a Home Inspection. The Buyer waives the right to said Inspection.

22. □ **A. RADON TEST.** This Contract is contingent upon the Buyer obtaining, at Buyer's expense, a Radon test indicating the Radon level to be the EPA standard of less than 4.0 pC/L, within ______ calendar days of the last of the Buyer and Seller to accept the Contract ("Inspection Approval Period"). This contingency shall be deemed waived unless Notice that the Radon levels exceed the EPA standards is received within the "Inspection Approval Period". If notice is given that Radon levels exceed EPA Standards, Buyer and Seller have ____ calendar days to reach an acceptable agreement. Failure to do so terminates the Contract. If the Contract is deemed terminated, the deposit shall be returned to the Buyer. The Buyer will supply to the Seller, if requested, a copy of the Radon test.

☒ **B. RADON TEST WAIVED.** Buyer(s) Initial: DJC / EEM The Buyer has been informed that it is in its best interest to make the Contract contingent upon a Radon test. The Buyer waives the right to said test.

23. □ **SUBJECT TO SALE OF BUYER'S PROPERTY (RECALL PROVISION).**

**CONTINGENCY CLAUSE.** This Contract to Purchase is contingent upon Buyer entering into a contingency free Contract to Purchase (financing contingency excepted) for the property now owned by Buyer at ______________________________________on or before _______ p.m. _____________ . If Buyer is unable to successfully enter into such Contract to Purchase or remove such contingency by that date and time, then this contract, unless extended by mutual written agreement, shall be terminated and the deposit shall be returned to the Buyer.

**RECALL CLAUSE.** It is understood that the Seller may continue to show the Premises to prospective buyers. Should a bona fide written offer be accepted by Seller, subject to this contract, Buyer agrees to remove the above contingency clause within ______ hours of Notice or this contract shall be deemed terminated. Termination of this contract shall be automatic _______ hours from the time of Notice unless Notice of removal of contingency has been delivered by that time.
It is further understood and agreed that if Buyer removes the above contingency clause, Buyer agrees to:
□ provide proof reasonably satisfactory to Seller of financial ability to close the transaction, and
□ submit an additional deposit of $ ____________, which shall become part of the purchase price. All deposits shall be non-refundable unless title does not pass by reason of the fault of the Seller.

24. ☐ **SUBJECT TO CLOSING OF BUYER'S PROPERTY PURSUANT TO EXISTING CONTRACT.** This Contract to Purchase is subject to transfer of title pursuant to an existing contract on Buyer's property located at ______________________________ on or before ______________. If said transfer is not completed by that time, Seller shall within 72 hours either (1) return to the Buyer any deposits, and this contract shall thereupon terminate, or, (2) extend this contract for an additional ______ calendar days with closing and possession dates to be adjusted accordingly.

25. **WELL/SEPTIC TESTING.** In the event the Premises are serviced by a private well or spring, or septic system, this Contract is subject to Seller, at Seller's expense, providing to the Buyer at least 15 days prior to closing

- A septic dye test evidencing no leakage, or such test as may otherwise be required by the County Health Department or Municipality
- A well test showing a minimum flow rate of 3 gallon per minute for 2 hours, or such test as may otherwise be required by Buyer's lending institution
- A water quality test complying with the minimum standards for the lender and/or County Health Department or Municipality.

Seller shall provide all test results to Buyer. If any test results do not pass, Seller may repair/replace the system(s) at Seller's expense. However, if Seller is unwilling to repair/replace the system(s), Seller shall give Notice to Buyer within 3 days of receipt of failed test. Within 7 days of receipt of Notice from Seller, Buyer may terminate the contract on Notice. In the event Buyer terminates the contract, the deposit shall be returned to the Buyer.

26. ☒ **OTHER CONTINGENCY.** It is understood and agreed that this Contract is made contingent upon:
JD ~~Offer expires at 7pm on 7/15/2026~~. DJC EEM

JD This Purchase Offer is contingent upon approval of the U.S. Bankruptcy Court, Northern District of New York. DJC EEM

27. **NOTICE.** Any notice required under this Contract shall be in writing (the "Notice"). Service of such Notice shall be given to the other party, or that party's attorney or real estate agent, and shall be personally delivered, transmitted by facsimile, emailed, delivered by overnight courier or by certified mail.

28. **PERSONS BOUND.** This document and the addenda annexed hereto, when signed by both parties, shall be a binding contract. This Contract contains the entire agreement of the parties and may not be changed or modified orally but only in writing by all parties to be bound. There are no warranties or representations except as set forth in this Contract, notwithstanding any other statements or documents. In the event that a dispute arises or a breach occurs and a lawsuit is commenced by or against any one of the parties or by or against any Broker involved in this transaction, the prevailing party to such lawsuit shall be entitled to recover the costs of litigation, including but not limited to reasonable attorneys fees.

29. **HOME EQUITY THEFT PREVENTION ACT.**

A. Buyer ☒ intends ☐ does not intend to use the Premises as Buyer's primary residence.

B. If Buyer **DOES NOT** intend to use the Premises as Buyer's primary residence, then Seller represents that premises ☐ is ☐ is not in foreclosure (lis pendens filed or property is on active tax lien sale list) **OR** that Seller ☐ is ☐ is not in default for two or more months on Seller's mortgage payments and the contract includes a reconveyance arrangement.

If the Premises is not to be used as Buyer's primary residence **AND** if the Seller is in foreclosure **OR** in default on the mortgage payments for two or more months and there is a reconveyance arrangement, then the **HOME EQUITY THEFT PREVENTION ACT ADDENDUM** is to be executed by the parties hereto, which addendum shall be made a part of this Contract as if the same were to be set forth herein at length.



This form was prepared by Amanda Stiles using the INSTANET FORMS internet contract management service.

THE FOLLOWING ADDENDA ARE INTENDED TO BE ANNEXED HERETO AND FORM A PART OF THIS CONTRACT:

- ☐ Disclosure Regarding Real Estate Agency Relationships; ☒ Seller's Disclosure of Property Condition;
- ☐ Contract Addendum; ☐ Lead Based Paint Addendum; ☐ Required FHA/VA Addendum
- ☒ Other: Property Information

This Contract is contingent upon approval by attorneys for Seller and Buyer. If either party does not identify an attorney and deliver a complete copy of this fully executed Contract to said attorney by two business days following execution of this Contract by all parties, this attorney approval contingency shall be deemed waived by that party. Each attorney shall have three business days exclusive of the day of receipt of a complete copy of this fully executed Contract within which to provide Notice of approval or disapproval of the Contract (the Approval Period). If party's attorney disapproves this Contract before the end of the Approval Period, this Contract is deemed terminated and all deposits shall be returned. A conditional approval shall be deemed a disapproval unless assented to by the other party's attorney within three business days of receipt of the conditional approval. Written communication by attorneys pursuant to this provision shall bind their respective clients. If a party's attorney neither approves, conditionally approves nor disapproves this Contract by the end of the Approval Period, this approval contingency is deemed waived by that party.

The parties hereto have executed this agreement as of the date and year first above written.

| | | | |
|---|---|---|---|
| AuthentiSIGN *Derek John Caramella* | 07/12/2026 | AuthentiSIGN *Joseph DiMino* | 07/21/2026 |
| Buyer Derek John Caramella | Date | Seller Joseph Dimino | Date |
| AuthentiSIGN *Elexis Elizabeth Medora Caramella* | 07/12/2026 | | |
| Buyer Elexis Elizabeth Medora Caramella | Date | Seller | Date |

| | |
|---|---|
| Edwina Schleider | Neil Bhatt |
| Name of Buyer's Attorney | Name of Seller's Attorney |
| | |
| Attorney Phone Number & Fax Number | Attorney Phone Number & Fax Number |
| eschleider@hhk.com | neil@bhattlawfirm.net |
| Attorney Email Address | Attorney Email Address |
| Hunt Real Estate, ERA | Skinner & Assoc. Realty LLC |
| Selling Company | Listing Company |
| 39HU1164281 | 10491205007 |
| Selling Brokerage License # | Listing Brokerage License # |
| Patrick Anson | Ebenn Maichak |
| Selling Agent | Listing Agent |
| 10401403914 | 10401395431 |
| Selling Agent License # | Listing Agent License # |
| 315-622-5757 315-622-1490 | 315-373-6896 |
| Selling Company Phone Number & Fax Number | Listing Company Phone Number & Fax Number |
| cnypatrick@gmail.com | ebennrealty@gmail.com |
| Selling Agent Email Address | Listing Agent Email Address |

**This form has been prepared for the sole use of the Central New York Information Service, Inc. and its members. The Central New York Information Service, Inc., its members and employees, assume no responsibility if this form fails to protect the interests of any party. Each party should secure its own legal, tax, financial or other advice.**

Initial here: Buyer(s) DJC / EEM Seller(s) JD / ____



**This form was prepared by Amanda Stiles using the INSTANET FORMS internet contract management service.**

Exhibit B

156965

*BROWNELL ABSTRACT CORPORATION, a corporation duly organized under the laws of the State of New York, hereby certifies:*
*That upon an examination of the records of the Onondaga County Clerk's Office vs. premises in the Town of Clay we find the following listed items vs. the person(s) listed below during the time period set opposite their name(s):*

*Starting Deed: 2021-44930*

*Additional Deeds: none*

*Mortgages: 2021-44931*

*Assignments of Mortgage: none*

*Judgments: none*

*State Tax Liens: none*

*Federal Tax Liens: none*

*UCC Filings vs. Real Estate only: none*

*Additional Instruments: none*

*Surrogates: none*

*Unless otherwise noted, judgments, state & federal tax liens were checked for the ten years last past.*
*Copies of all above noted instruments are attached herewith.*

| NAME | FROM | TO |
|---|---|---|
| Joseph (A.) Dimino | August 31, 2021 | June 28, 2023 |

*AS TO A GRANTOR ONLY SEARCH IN ONONDAGA COUNTY VS. JOSEPH A. DIMINO FOR THE TEN YEARS LAST PAST TO THE DATE HEREOF:*

*nothing found.*

*TMP#063.-05-06.0*

*IN WITNESS WHEREOF, the said*
**Brownell Abstract Corporation**
*has caused its corporate signature and seal to be hereunto affixed by its President duly authorized thereto, this 28th day of June 2023 at 8:30 o'clock A.M.*

**BROWNELL ABSTRACT CORPORATION**
By

Michael Yonkovig
President

Lisa Dell, County Clerk
401 Montgomery Street
Room 200
Syracuse, NY 13202
(315) 435-2229

# Onondaga County Clerk Recording Cover Sheet

**Received From :**
BANKERS TITLE
225 GREENFIELD PKWY
STE 207
LIVERPOOL, NY 13088

**Return To :**
BANKERS TITLE & ABSTRACT LLC
225 GREENFIELD PKWY
STE 207
LIVERPOOL, NY 13088

**Method Returned :** MAIL

**First PARTY 1**
MCHENRY, TIMOTHY

**First PARTY 2**
DIMINO, JOSEPH A

**Index Type :** Land Records
**Instr Number :** 2021-00044930
**Book :** **Page :**

**Type of Instrument :** Deed
**Type of Transaction :** Deed Residential
**Recording Fee:** $195.50

**Recording Pages :** 3

The Property affected by this instrument is situated in Clay, in the County of Onondaga, New York

**Real Estate Transfer Tax**

| | |
|---|---|
| **RETT # :** | 2060 |
| **Deed Amount :** | $440,000.00 |
| **RETT Amount :** | $1,760.00 |
| **Total Fees :** | $1,955.50 |

State of New York

County of Onondaga

I hereby certify that the within and foregoing was recorded in the Clerk's office for Onondaga County, New York

On (Recorded Date) : 09/21/2021

At (Recorded Time) : 2:36:24 PM

Doc ID - 044947790003

Lisa Dell, County Clerk

This sheet constitutes the Clerks endorsement required by Section 319 of Real Property Law of the State of New York

Entered By: RSWEENIE Printed On : 09/21/2021 At : 2:38:40PM

*WARRANTY DEED, Short Form with Lien Covenant, Ind. or Corp.*

**THIS INDENTURE**, made on 1st day of SEPT, 2021,

**BETWEEN** **TIMOTHY McHENRY and ANGELA McHENRY,** husband and wife, of 4815 Lepinske Farm Place, Clay, New York 13041,

grantor,

Joseph A. DiMino of 1323 Cheshire Lane Bel Air, MD 21014

grantee,

**WITNESSETH,** that the grantor, in consideration of One and 00/100 Dollar ($1.00), and other valuable consideration, paid by the grantee, hereby grants and releases unto the grantee, the heirs or successors and assigns of the grantee forever,

**SEE ATTACHED "SCHEDULE A" – LEGAL DESCRIPTION**

**SUBJECT TO** easements, covenants and restrictions of record, if any.

**BEING THE SAME** premises conveyed to Grantor herein by Warranty Deed dated June 30, 2017, and recorded in the Onondaga County Clerk's Office on July 18, 2017, in Book No. 5434 of Deeds at Page 644.

**TOGETHER** with the appurtenances and all the estate and rights of the grantor in and to said premises.

**TO HAVE AND TO HOLD** the premises herein granted unto the grantee, the heirs or successors and assigns of the grantee forever. AND the grantor covenants as follows:
**FIRST.** The grantee shall quietly enjoy the said premises;
**SECOND.** The grantor will forever warrant the title to said premises.

This deed is subject to the trust provisions of Section 13 of the Lien Law. The words "grantor" and "grantee" shall be construed to read in the plural whenever the sense of this deed so requires.

**IN WITNESS WHEREOF,** the grantor has executed this deed the day and year first above written.

Bankers Title + Abstract LLC
225 Greenfield Pkwy, Ste 207
Liverpool NY 13088

**In presence of:**

[signature] L.S.
**Timothy McHenry**

[signature] L.S.
**Angela McHenry**

**ACKNOWLEDGMENT RPL309-a (Do not use outside New York State)**

**State of New York, County of Onondaga ss.:**

On the 1st day of SEPT, 2021, before me, the undersigned, personally appeared **Timothy McHenry and Angela McHenry,** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

[signature]
Notary Public

ROCCO MANGANO
NOTARY PUBLIC, State of New York
Qualified in Onon. Co. No. 02MA4757912
Commission Expires January 31, 2023

**File Number: 2021-00044930 Seq: 2**

## "SCHEDULE A"

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Clay, County of Onondaga and State of New York, being part of Military Lot No. 38 in said Town and being more particularly described as Lot No. 107 of The Farmstead, Section No. 2, according to a map of said tract made by Ianuzi & Romans Land Surveying, P.C., dated June 27, 2013 and last revised May 28, 2014 and filed in the Onondaga County Clerk's Office on June 9, 2014 as Map No. 11852.

Lisa Dell, County Clerk
401 Montgomery Street
Room 200
Syracuse, NY 13202
(315) 435-2229

# Onondaga County Clerk Recording Cover Sheet

**Received From :**
BANKERS TITLE
225 GREENFIELD PKWY
STE 207
LIVERPOOL, NY 13088

**Return To :**
MOVEMENT MORTGAGE LLC
8024 CALVIN HALL ROAD
INDIAN LAND, SC 29707

**Method Returned :** MAIL

**First PARTY 1**
DIMINO, JOSEPH

**First PARTY 2**
MOVEMENT MORTGAGE LLC

**Index Type :** Land Records
**Instr Number :** 2021-00044931
**Book :** **Page :**

**Type of Instrument :** Mortgage
**Type of Transaction :** Mtg Type B
**Recording Fee:** $145.50
**Recording Pages :** 21

The Property affected by this instrument is situated in Clay, in the County of Onondaga, New York

**Mortgage Taxes**

| | |
|---|---|
| **Property Located :** | Clay |
| **Serial Number :** | DM9322 |
| **Mortgage Amount :** | $416,361.00 |
| **Basic Tax :** | $2,082.00 |
| **Local Tax :** | $0.00 |
| **Additional Tax :** | $1,016.00 |
| **Transportation Auth Tax :** | $0.00 |
| **SONYMA :** | $1,041.00 |
| **County Tax :** | $0.00 |
| **Total :** | $4,139.00 |
| **Total Fees :** | $4,284.50 |

State of New York

County of Onondaga

I hereby certify that the within and foregoing was recorded in the Clerk's office for Onondaga County, New York

On (Recorded Date) : 09/21/2021

At (Recorded Time) : 2:36:25 PM

Doc ID - 044947800021

Lisa Dell, County Clerk

This sheet constitutes the Clerks endorsement required by Section 319 of Real Property Law of the State of New York

Entered By: RSWEENIE Printed On : 09/21/2021 At : 2:38:42PM

Prepared By:
CHERYL HACKER
MOVEMENT MORTGAGE, LLC
8024 CALVIN HALL ROAD
INDIAN LAND, SC 29707
888-589-4416

After Recording Return To:
MOVEMENT MORTGAGE, LLC
8024 CALVIN HALL RD
INDIAN LAND, SC 29707
888-589-4416

[Space Above This Line For Recording Data]

# MORTGAGE

DIMINO
Loan #: 3540625
Serv. #: 3010145946
MIN: 100670800035406255
MERS Phone: 1-888-679-6377
PIN: 063.-05-06.0
Case #: 06-06-6-0761687

**NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.**

**WORDS USED OFTEN IN THIS DOCUMENT**

(A) **"Security Instrument."** This document, which is dated SEPTEMBER 14, 2021, together with all Riders to this document, will be called the "Security Instrument."

(B) **"Borrower."** JOSEPH DIMINO , A MARRIED MAN, whose address is 1323 CHESHIRE LANE, BEL AIR, MD 21014 US sometimes will be called "Borrower" and sometimes simply "I" or "me."

(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and existing under the laws of Delaware, and has a mailing address of P.O. Box 2026, Flint, MI 48501-2026, and a street address of 1901 E Voorhees Street, Suite C, Danville, IL 61834. The MERS telephone number is (888) 679-MERS. **FOR PURPOSES OF RECORDING THIS MORTGAGE, MERS IS THE MORTGAGEE OF RECORD.**

(D) **"Lender."** MOVEMENT MORTGAGE, LLC will be called "Lender." Lender is a corporation or association which exists under the laws of DELAWARE. Lender's address is 8024 CALVIN HALL ROAD

INDIAN LAND, SC 29707.

**(E) "Note."** The note signed by Borrower and dated SEPTEMBER 14, 2021 will be called the "Note." The Note shows that I owe Lender FOUR HUNDRED SIXTEEN THOUSAND THREE HUNDRED SIXTY-ONE AND 00/100 Dollars (U.S. $416,361.00) plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by OCTOBER 1, 2051.

**(F) "Property."** The property that is described below in the section titled "Description of the Property," will be called the "Property."

**(G) "Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**(I) "Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider
☐ Balloon Rider
☐ 1-4 Family Rider
☒ VA Rider
☐ Condominium Rider
☐ Planned Unit Development Rider
☐ Other(s) [specify]
☐ Second Home Rider
☐ Biweekly Payment Rider

**(J) "Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

**(K) "Community Association Dues, Fees, and Assessments."** All dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

**(L) "Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

**(N) "Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in, Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

**(O) "Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

**(Q) "RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY**

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors and assigns) and its successors and assigns subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;
(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and
(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and
(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

**DESCRIPTION OF THE PROPERTY**

I give MERS (solely as nominee for Lender and Lender's successors and assigns) rights in the Property described in (A) through (G) below:

(A) The Property which is located at 4815 LEPINSKE FARM PLACE, CLAY, NY 13041. This Property is in ONONDAGA County. It has the following legal description:

SEE EXHIBIT A LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

(B) All buildings and other improvements that are located on the Property described in subsection

**SCHEDULE "A"**

RE: 4815 Lepinske Farm Place; Clay, NY 13041

**ALL THAT TRACT OR PARCEL OF LAND**, situate in the Town of Clay, County of Onondaga and State of New York, being part of Military Lot No. 38 in said Town and being more particularly described as Lot No. 107 of The Farmstead Section No. 2, according to a map of said tract made by Ianuzi & Romans Land Surveying, P.C., dated June 27, 2013 and last revised May 28, 2014 and filed in the Onondaga County Clerk's Office on June 9, 2014 as Map No. 11852.

S/B/L: 063.-05-06.0
Note: Any reference made to property address and tax lot information is being shown for reference only.

(A) of this section;
(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"
(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;
(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;
(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and
(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

**COVENANTS**

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If

Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;
Next, to pay principal due under the Note; and
Next, to pay the amounts due Lender under Section 3 of this Security Instrument.
Such payments will be applied to each Periodic Payment in the order in which it became due.
Any remaining amounts will be applied as follows:
First, to pay any late charges;
Next, to pay any other amounts due under this Security Instrument; and
Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**

**(a) Borrower's Obligations.** I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

> (1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);
(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;
(4) The premium for Mortgage Insurance (if any);
(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and
(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

**(b) Lender's Obligations.** Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable

Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

**(c) Adjustments to the Escrow Funds.** Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments And Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires

coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not

economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30- day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

**(a) Maintenance and Protection of the Property.** I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

**(b) Lender's Inspection of Property.** Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or

did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I will not give up the rights that I have as a tenant on the Property. I will not cancel or terminate my lease and I will not change or alter that lease unless Lender agrees in writing to the change or amendment. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments

to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."

It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires

interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

**(a) Borrower's Obligations.** Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b) Lender's Rights.** Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the

following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;
(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;
(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and
(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS**

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements. Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."**

**If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.**

**Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:**

**(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;**

**(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:**

**(1) The promise or agreement that I failed to keep or the default that has occurred;**

**(2) The action that I must take to correct that default;**

**(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;**

**(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;**

**(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and**

**(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and**

**(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.**

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

**24. Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

3010145946 3540625

**25. Borrower's Statement Regarding the Property [check box as applicable].**
☒ This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.
☐ This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.
☐ This Security Instrument does not cover real property improved as described above.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 19 of this Security Instrument and in any Rider signed by me and recorded with it.

\- BORROWER - JOSEPH DIMINO

3010145946 3540625

[Space Below This Line For Acknowledgment]

State of New York

County of ONONDAGA

On the 14 day of September in the year 2021 before me, the undersigned, personally appeared Joseph Dimino

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

SCOTT D. CERIO
NOTARY PUBLIC, STATE OF NEW YORK
Qualified in Onondaga County
No. 02CE6357588
Commission Expires April 24 2025

Notary Public

My Commission Expires: 2025

Individual Loan Originator: KIM ANTENUCCI, NMLSR ID: 1145867
Loan Originator Organization: MOVEMENT MORTGAGE, LLC, NMLSR ID: 39179

Exhibit C

< Back to search

Save Share ··· More

Search
Updates
Favorites
Plan
Inbox






Source: NYSAMLSs

Zestimate®
**$439,100**
4815 Lepinske Farm Pl Lot 107, Clay, NY 13041

**4** beds **3** baths **1,920** sqft

Est. refi payment: **$3,162/mo** Refinance your loan

- SingleFamily
- Built in 2017
- -- sqft lot
- $439,100 Zestimate®
- $229/sqft
- $3,215 Estimated rent

## Sell for more on Zillow

Get a Zillow Showcase℠ listing at no additional cost and you could sell for 2% more.

| | |
|---|---|
| Standard listing | $439,100 |
| 2% more | **+$8,782** |
| With Zillow Showcase (estimated) | **$447,882** |

Unlock your offer
In just 3 min, no obligation

Claim home

## Home value

| Zestimate® | Estimated sales range | Rent Zestimate® |
|---|---|---|
| **$439,100** | **$417,000 - $461,000** | **$3,215/mo** |

### Help make your Zestimate® more accurate

Edit home facts

### Zestimate® history

Table view

**+26% in last 6 years**

Home values  Rent Zestimate  Tax paid



Exhibit D

SKINNER ASSOCIATES REALTY

# EXCLUSIVE RIGHT TO SELL AGREEMENT

Approved as to form by the Central New York Information Service, Inc. (CNYIS)

Compensation is not set by law or any REALTOR® Association or MLS and that compensation to Broker is fully negotiable between the Seller and the Broker. This is a legally binding contract. If you have any questions concerning this contract, you should consult an attorney before signing it.

**Property Address:** 4815 Lepinske Farm Place Clay NY 13041

**Seller:** Joseph DiMino **Tax Map#:** 312489-063-000-0005-006-000-0000

**Seller:** ________ **Phone:** ________

**Seller's address:** ________ , ,

**Listing Broker:** Skinner & Assoc. Realty LLC **Phone:** ________

**Listing Agent:** Ebenn Maichak **Phone:** 680-910-3924

**Definitions:** In compliance with Regulation 175.24 under Article 12-A of the NYS Real Property Law the following is an "EXPLANATION: An "exclusive right to sell" listing means that if you, the Owner of the Property, find a buyer for your house, or if another broker finds a buyer, you must pay the agreed commission to the present broker. An "exclusive agency" listing means that if you, the owner of the property find a buyer, you will not have to pay a commission to the broker. However, if another broker finds a buyer, you will owe a commission to both the selling broker and your present broker."

JD **(Seller Initials)** _______ **(Seller Initials)** **"I have read and understand the definitions stated above."**

The Multiple Listing System ("MLS") is the orderly correlation and on-line dissemination of listing information to the Brokers enabling them to share information and work together to better facilitate and execute real estate transactions so they may better serve the buying and selling public.

**1. Grant of Exclusive Right to Sell/Term of Listing:** In consideration of the Listing Broker submitting information about the Property into the MLS, the undersigned **Seller** (the word **Seller** refers to each and all parties who have an interest in the property and the undersigned represent that they are the sole and exclusive owners and/or are fully authorized to enter into this agreement) hereby grants to said Listing Broker, the exclusive right to sell the Property for $ 579,999.00, from 6/12/2026 ("list date") until 9/12/2026 ("expiration date") ("term of the listing") and to offer cooperation to all members of CNYIS and Cooperating Brokers Seller hereby instructs Listing Broker to submit this listing to the MLS System within 24 hours of the list date for circulation to all members of the service. Listings are subject to the rules and regulations of the service. If on such expiration date, there is a pending contract of sale in effect and the transaction has not closed, this agreement shall continue in effect beyond the expiration date through the date of closing or earlier termination of contract, whichever first occurs.

**2. Fair Housing – Home Seller's Responsibility:** As the Seller, you agree not to discriminate in the sale, rental or financing of your property, nor can you do so through your real estate broker or salesperson who are also bound by anti-discrimination laws. For more information on Fair Housing Act Rights and Responsibilities, please visit https://dhr.ny.gov/fairhousing and https://www.dos.ny.gov/licensing/fairhousing.html

**3. Property Information:** As the Seller of residential real property, Seller understands that they must complete and sign a Property Condition Disclosure Statement (PCDS) as required by Section 462 of the NYS Real Property Law. Except as is provided in Section 463, every seller of residential real property pursuant to a real estate purchase contract shall complete and sign a PCDS and cause it, or a copy thereof, to be delivered to a buyer prior to buyer's signing a binding contract of sale. A copy of the PCDS containing the signatures of both seller and buyer shall be attached to the real estate purchase contract. Nothing contained in this disclosure statement is intended to prevent the parties to a contract of sale from entering into agreements of any kind or nature with respect to the physical condition of the property to be sold, including, but not limited to, agreements for the sale of real property "as is". Seller should seek the advice of their attorney about completing the PCDS.

Seller will provide a signed MLS Property Data Form and certify that the information provided is accurate to the best of the Seller's knowledge. If the residential dwelling was constructed prior to 1978, the Seller must complete the Federally mandated Lead Paint Disclosure Addendum. Seller to provide working smoke and carbon monoxide detectors as prescribed by law prior to closing.

**4. Listening Devices**: Penal Law Section 250.05: "A person is guilty of eavesdropping when he unlawfully engages in wiretapping, mechanical overhearing of a conversation or intercepting or accessing of an electronic communication. The crime of eavesdropping is a Class E felony." Penal Law 250.00(2) defines mechanical overhearing of a conversation as "the intentional overhearing or recording of a conversation or discussion, without the consent of at least one party thereto, by a person not present thereat, by means of any instrument, device or equipment."

**5. Seller's Authorizations and Obligations:** Seller grants to Listing Broker full discretion to determine the appropriate marketing approach for the Property. Listing Broker will undertake to find a ready, willing and able Buyer and in order to do so may engage in public marketing which may include, but not limited to, advertising, showing of said Property and/or conducting open houses, creating flyers displayed in windows, installing yard signs, creating digital marketing on public facing websites, creating brokerage website displays

Property. 4815 Lepinske Farm Place Clay NY 13041

(including IDX and VOW), digital communication marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public. If any public marketing of the property is done, the Listing Broker must submit the listing to the MLS.

**A. Seller Listing Options**:

Seller agrees to allow the use of a lockbox or to provide keys to the Property to Cooperating Brokers and permit showings of the Property at any reasonable hour. Seller understands that providing a key and/or use of lockbox to the Property does not in any way make Listing Broker the custodian of said Property or responsible thereof. Seller agrees to refer any and all inquiries concerning said Property to Listing Broker. Seller understands that in order to facilitate the sale of said property, Seller hereby authorizes:

**(Seller initial all that apply)**

JD /______ the use of a **lockbox**

JD /______ **photographing** and/or filming of interior and/or exterior of the property and the use of such in promoting its sale

JD /______ the placement of a **FOR SALE** sign on the property

Seller hereby assigns to Listing Broker any and all rights to the listing content, which includes but is not limited to the following elements: photographs, films, images, graphics, video recordings, virtual tours, drawings, written descriptions, remarks, narratives and pricing information, and any other copyrightable elements relating to the Property ("Listing Content"). Seller also authorizes CNYIS to receive compensation for the distribution of this information. Seller authorizes the distribution of the Listing Content.

Seller acknowledges that CNYIS brokers may publish listings of other CNYIS and participant brokers on their web sites, except if a Seller prohibits the distribution of such information. Subject to Section B below, Broker's website may also allow third parties to (i) write comments or reviews about the Property or display a hyperlink to comments or reviews in immediate conjunction with particular listings, or (ii) display an automated estimate of the market value of the Property (or hyperlink to such estimate) or other listings in immediate conjunction with the Property.

**B. Seller Hyperlink Options:**

Seller [ ] authorizes [ ] **does not** authorize third-parties to write comments or reviews about the Property or provide hyperlinks to comments or reviews to any property in immediate conjunction with the Property. (Referred to on Property Data Form as TPC Y/N)

Seller [ ] authorizes [ ] **does not** authorize an automated estimate of the market value of the Property (or any hyperlink to such estimate) or any property in immediate conjunction with the listing. (Referred to on Property Data Form as AVM Y/N)

_________ **(Seller's Initials)** _________ **(Seller's Initials)**

**C. Seller Internet Options**:

Seller [X] authorizes [ ] **does not** authorize Property **to be displayed on the Internet**. Seller understands and acknowledges by not displaying the Property on the Internet, consumers who conduct Internet searches for listings will not see information about the Property.

Seller has advised Listing Broker that Seller [X] does [ ] **does not** want the **address of the Property displayed on the Internet**.

JD **(Seller's Initials)** _________ **(Seller's Initials)**

**6. Maintenance of Property During Listing Period**: Listing Broker is not the caretaker of the Property and is not responsible for maintenance or utilities. Seller shall make arrangements for snow removal and lawn maintenance. For vacant properties, arrangements should be made for third parties to inspect the property regularly and report any problems to Seller. Broker is not responsible for the condition of the property.

**7. Contract To Purchase Contingencies:** Seller agrees to accept a contract to purchase contingent, for a reasonable period of time, on Buyer's ability to finance the purchase price by any of the prevailing methods of mortgage financing, and on Buyer's ability to obtain inspections by a New York State Licensed Home Inspector, Architect or Engineer and radon tests.

**8. Association and Multiple Listing Service are not Agents:** Seller understands and agrees that Greater Syracuse Association of REALTORS® and CNYIS are not Seller's agents and that none of the terms of this agreement shall make them Seller's agents.

**9. Broker Compensation:** Seller agrees the Broker fee will be due and payable to as hereinafter set forth:

(a) If prior to the expiration date, a Buyer for the property is secured by Seller or by any other person at the sale price and terms contained in this contract or for any other sales price and terms acceptable to Seller or Seller agrees to sell, transfer or exchange the property, or

(b) If, within 120 days after the expiration date (the protection period), Seller agrees to sell, transfer or exchange said Property to or with any person to whom the Property had been shown during the term of the listing, Seller will pay Broker Compensation as if Broker had arranged the transaction. However, Seller shall not be obligated to pay such compensation if during the protection period a valid listing agreement is entered into in good faith with another licensed real estate Broker for the sale, lease or exchange of Property.

(c) Seller hereby authorizes and directs that the Broker Compensation, or the balance thereof after deducting from said fee the earnest money deposit held by Broker, shall be paid from the proceeds of the sale of the Property at the time of closing. Broker's delivery of its commission statement to Seller's attorney, lender's attorney or any other settlement agent shall constitute instructions to said person to pay the commission due from any closing proceeds. In the event the proceeds are insufficient, the balance shall be paid by Seller by cashier's check issued by any bank, credit union or savings and loan association.

**(d) At the time of closing, you may be required to deposit the Broker's commission with the County Clerk in the event that you do not pay the Broker his or her commission as set forth herein. Your obligation to deposit the Broker's commission with the County Clerk may be waived by the Broker.**

(e). JD / _____ PLEASE INITIAL: Seller understands that compensation is not set by law or any Realtor® Association or MLS and that compensation is fully negotiable between the Seller and the Listing Broker. An offer of compensation to the Cooperating Broker who produces the buyer for the listed property is not required. However, Seller may choose to offer compensation directly to the Cooperating Broker or through the Listing Broker to the Cooperating Broker. A Seller may receive requests for compensation from a Cooperating Broker as part of the purchase offer or separately. The Seller has the right to accept, reject or negotiate the amount of compensation being requested by the Cooperating Broker from the Seller.

**Listing Broker Compensation:**

Seller shall pay the Listing Broker compensation of 2.5 % of the selling price or a fee of $__________ at closing whichever is the greater sum unless modified in paragraph 9(b).

In the event of sub agency, dual agency, dual agency with designated sales agent, unrepresented buyer, or those buyers brought to the property by the seller, Seller shall pay the Listing Broker additional compensation of __________ % of the selling price or a fee of $__________ at closing whichever is the greater sum. (For explanation of the types of agencies, please see NYS Agency Disclosure Form).

**Cooperating Broker Compensation**: (select one option below)

[ ] Seller is offering compensation to Cooperating Broker of ____ % of the selling price or a fee of $__________ at closing.

[ X ] Seller is not offering compensation to Cooperating Broker.

Said compensation shall be earned and payable under any of the following conditions: (a) If the Listing Broker or Cooperating Broker produces a buyer ready willing and able to purchase the Property on such terms and conditions acceptable to the Seller: (b) If through the Listing Broker or Cooperating Broker's efforts a buyer and seller reach an agreement upon all the essential terms of a transaction: (c) If the property is sold or rented during the term of this Listing Agreement whether or not the sale or rental is a result of the Listing Brokers efforts and even if the Property is sold as a result of the efforts of the Seller or any other broker or agent not acting under this Listing Agreement.

**10. Application of Deposit**: The deposit that shall be made under the terms of the Buyer's Contract of Sale (the "earnest money deposit") shall be placed in a non-interest bearing escrow account until closing or cancellation of the purchase contract evidenced by a release signed by all parties and their brokers, or Court Order. The Broker shall apply and pay any deposits or other money received as part of the purchase price toward any Brokerage fee which may be due under this agreement.

**11. Negotiation, Presentation and Subsequent Contracts to Purchase:**

**Seller authorizes** all negotiations of contracts through [ ] Listing Broker Only [X] Seller directly

**Cooperating brokers are permitted to be present at purchase offer presentation with the Seller unless otherwise specified by Seller in writing.**

**Once a contract has been signed by all parties, Broker has an obligation to disclose the existence of the contract, including offers with unresolved contingencies, to any broker seeking cooperation.** Broker shall continue to submit to Seller all offers and counter-offers until closing, or execution of a lease, unless Seller waives this obligation in writing. Broker shall not be obligated to continue to market the property after an offer has been accepted by Seller. **Consult with your attorney before accepting any subsequent Contracts to Purchase as you may have additional liability on both Contracts to Purchase.**

**12. Rental of Property:** Should the Seller desire to rent the property during the period of this agreement, the Listing Broker is hereby granted the sole and exclusive right to rent the Property and to place a "For Rent" sign upon the property. The Seller agrees to pay the Listing Broker a rental commission of ____________. The commission for the term of the lease is due and payable (check one) __ upon execution of the lease __ upon date of occupancy. The commission for any renewal of the lease is due and payable upon the commencement of the new term. In the event that the property is sold during the term of the lease the Brokerage Compensation under paragraph 9 above shall be due and payable.

**13. Termination:** Seller understands that if Seller terminates Listing Broker's authority prior to the expiration date or through the protection period, if applicable, Listing Broker shall retain its contract rights (including, but not limited to, recovery of its Brokerage Compensation, advertising expenses and/or any other damages incurred).

**14. Notice:** Any notice or request required or agreed to be given under this Contract shall be sufficiently given if it is in writing and signed by the party giving it, or that party's attorney or real estate agent. Service of any such notice shall be completed upon receipt of such notice by the other party, or that party's attorney or real estate agent, and may be personally delivered, transmitted by facsimile, emailed, delivered by courier, or mailed. Unless otherwise agreed, for the purposes of this Contract, signatures transmitted by facsimile or email shall have the same force and effect as original signatures.

**15. Default:** If the Seller shall default in the observation or performance of any term or covenant on the Seller's part to be observed or performed under or by virtue of any of the terms or provisions of this Contract and if the Broker, in connection with any said default, makes any expenditure or incurs any obligations for the payment of money, including but not limited to attorney's fees, in instituting, prosecuting or defending any action or proceeding, then such sums so paid or obligations incurred shall be paid by the Seller to the Broker.

**16. Dual Agency:**

**A. Disclosure of Potential Conflicts With Other Clients of Broker:** Seller acknowledges that Broker has disclosed and discussed the possibility that:

1. Other potential sellers have listed or may list their property with the Broker which may involve the sale or lease of similar property as Broker is attempting to market on Seller's behalf.
2. Potential buyers have entered into or may enter into agency agreements with Broker which may involve an attempt to purchase or lease similar property Broker is attempting to sell or lease on Seller's behalf.

Seller consents to Broker's representation of other seller and buyer clients.

**B. Consent to Potential Dual Agency:** Seller further provides consent to a dual agency representation of both Seller and a buyer client of Broker who may be interested in purchasing Seller's property, with the understanding that the buyer and the Seller will each have the opportunity to determine, at that time, whether to authorize Broker to proceed as a dual agent or not. Seller understands that in a dual agency representation Broker cannot provide the full range of fiduciary duties, including individual loyalty to either party, but that Seller will continue to be provided with Broker's good faith and honest efforts and that the confidentiality of the information Seller imparts to Broker will be preserved.

**C. Broker Duty to Disclose Specific Conflicts:** If any buyer client of Broker expresses an interest in Seller's property or properties, Broker shall immediately notify the buyer and Seller of the pertinent facts, including that a potential dual agency situation has arisen and that the following options are available:

1. Buyer may become a customer rather than a client of Broker.
2. Buyer may be released from their agency agreement with Broker and may secure representation from another Broker and/or lawyer.
3. With informed consent, both the buyer and seller may elect to continue with Broker serving as a dual agent. If both parties do not consent to dual agency, other arrangements must be made, as set forth above.

- ...arm Place Clay NY 13041

**D. Broker Duty When Acting as a Dual Agent**: Broker may not advocate the interest of one client over the other and may not without express permission of the respective party, disclose to the other party that seller will accept a price less than the listed price, or that buyer will pay a price greater than the offered price. Broker's position as a dual agent shall be neutral and evenhanded with respect to both parties. Broker may act as a mediator between the parties

**17. Entire Agreement:** Seller has read and understands this agreement and does hereby acknowledge receipt of a copy thereof. This contract contains the entire understanding of the parties and there are no promises, terms, conditions, representations, warranties, undertakings, or understandings by either Party to the other, except as expressly set forth in this Contract. No modification or waiver of any provision of this Contract shall be binding unless made in writing and signed by both Parties.

**Seller:** Joseph DiMino

**Seller:** ______

**Date:** 06.09.26

**Broker:** Skinner & Assoc. Realty LLC

**By:** Ebenn Maichak

**Date:** 06.09.26

This form has been prepared for the sole use of the Central New York Information Service, Inc. and its members The Central New York Information Service, Inc., its members and employees, assume no responsibility if this form fails to protect the interests of any party Each party should secure its own legal, tax, financial or other advice

New York State
DEPARTMENT OF STATE
Division of Licensing Services
P.O. Box 22001
Albany, NY 12201-2001

SKINNER ASSOCIATES REALTY

Customer Service: (518) 474-4429
www.dos.state.ny.us

# New York State Disclosure Form for Buyer and Seller

## THIS IS NOT A CONTRACT

*New York State law requires real estate licensees who are acting as agents of buyers or sellers of property to advise the potential buyers or sellers with whom they work of the nature of their agency relationship and the rights and obligations it creates. This disclosure will help you to make informed choices about your relationship with the real estate broker and its sales agents.*

*Throughout the transaction you may receive more than one disclosure form. The law may require each agent assisting in the transaction to present you with this disclosure form. A real estate agent is a person qualified to advise about real estate.*

*If you need legal, tax or other advice, consult with a professional in that field.*

## Disclosure Regarding Real Estate Agency Relationships

### Seller's Agent

A seller's agent is an agent who is engaged by a seller to represent the seller's interests. The seller's agent does this by securing a buyer for the seller's home at a price and on terms acceptable to the seller. A seller's agent has, without limitation, the following fiduciary duties to the seller: reasonable care, undivided loyalty, confidentiality, full disclosure, obedience and duty to account. A seller's agent does not represent the interests of the buyer. The obligations of a seller's agent are also subject to any specific provisions set forth in an agreement between the agent and the seller. In dealings with the buyer, a seller's agent should (a) exercise reasonable skill and care in performance of the agent's duties; (b) deal honestly, fairly and in good faith; and (c) disclose all facts known to the agent materially affecting the value or desirability of property, except as otherwise provided by law.

### Buyer's Agent

A buyer's agent is an agent who is engaged by a buyer to represent the buyer's interests. The buyer's agent does this by negotiating the purchase of a home at a price and on terms acceptable to the buyer. A buyer's agent has, without limitation, the following fiduciary duties to the buyer: reasonable care, undivided loyalty, confidentiality, full disclosure, obedience and duty to account. A buyer's agent does not represent the interest of the seller. The obligations of a buyer's agent are also subject to any specific provisions set forth in an agreement between the agent and the buyer. In dealings with the seller, a buyer's agent should (a) exercise reasonable skill and care in performance of the agent's duties; (b) deal honestly, fairly and in good faith; and (c) disclose all facts known to the agent materially affecting the buyer's ability and/or willingness to perform a contract to acquire seller's property that are not inconsistent with the agent's fiduciary duties to the buyer.

### Broker's Agents

A broker's agent is an agent that cooperates or is engaged by a listing agent or a buyer's agent (but does not work for the same firm as the listing agent or buyer's agent) to assist the listing agent or buyer's agent in locating a property to sell or buy, respectively, for the listing agent's seller or the buyer agent's buyer. The broker's agent does not have a direct relationship with the buyer or seller and the buyer or seller can not provide instructions or direction directly to the broker's agent. The buyer and the seller therefore do not have vicarious liability for the acts of the broker's agent. The listing agent or buyer's agent do provide direction and instruction to the broker's agent and therefore the listing agent or buyer's agent will have liability for the acts of the broker's agent.

### Dual Agent

A real estate broker may represent both the buyer and seller if both the buyer and seller give their informed consent in writing. In such a dual agency situation, the agent will not be able to provide the full range of fiduciary duties to the buyer and seller. The obligations of an agent are also subject to any specific provisions set forth in an agreement between the agent, and the buyer and seller. An agent acting as a dual agent must explain carefully to

both the buyer and seller that the agent is acting for the other party as well. The agent should also explain the possible effects of dual representation, including that by consenting to the dual agency relationship the buyer and seller are giving up their right to undivided loyalty. A buyer or seller should carefully consider the possible consequences of a dual agency relationship before agreeing to such representation. A seller or buyer may provide advance informed consent to dual agency by indicating the same on this form.

## Dual Agent with Designated Sales Agents

If the buyer and seller provide their informed consent in writing, the principals and the real estate broker who represents both parties as a dual agent may designate a sales agent to represent the buyer and another sales agent to represent the seller to negotiate the purchase and sale of real estate. A sales agent works under the supervision of the real estate broker. With the informed consent of the buyer and the seller in writing, the designated sales agent for the buyer will function as the buyer's agent representing the interests of and advocating on behalf of the buyer and the designated sales agent for the seller will function as the seller's agent representing the interests of and advocating on behalf of the seller in the negotiations between the buyer and seller. A designated sales agent cannot provide the full range of fiduciary duties to the buyer or seller. The designated sales agent must explain that like the dual agent under whose supervision they function, they cannot provide undivided loyalty. A buyer or seller should carefully consider the possible consequences of a dual agency relationship with designated sales agents before agreeing to such representation. A seller or buyer may provide advance informed consent to dual agency with designated sales agents by indicating the same on this form.

This form was provided to me by Ebenn Maichak (print name of licensee) of Skinner & Assoc. Realty LL (print name of company, firm or brokerage), a licensed real estate broker acting in the interest of the:

(X) Seller as a (check relationship below)

- (X) Seller's agent
- (____) Broker's agent

(____) Buyer as a (check relationship below)

- (____) Buyer's agent
- (____) Broker's agent

(____) Dual agent

(____) Dual agent with designated sales agent

For advance informed consent to either dual agency or dual agency with designated sales agents complete section below.

(____) Advance informed consent dual agency

(____) Advance informed consent to dual agency with designated sales agents

If dual agent with designated sales agents is indicated above: ____________ is appointed to represent the buyer; and Ebenn Maichak is appointed to represent the seller in this transaction.

(I) (We) Joseph DiMino acknowledge receipt of a copy of this disclosure form: signature of ( ) Buyer(s) and/or ( X ) Seller(s):

Joseph DiMino

Date: 09 JUN 2026

Date: ____________


This form was prepared by Ebenn Maichak using the INSTANET FORMS internet contract management service

NEW YORK STATE OF OPPORTUNITY. | Division of Licensing Services

New York State
Department of State, Division of Licensing Services
(518) 474-4429
www.dos.ny.gov

New York State
Division of Consumer Rights
(888) 392-3644

# New York State Housing and Anti-Discrimination Disclosure Form

Federal, State and local Fair Housing Laws provide comprehensive protections from discrimination in housing. It is unlawful for any property owner, landlord, property manager or other person who sells, rents or leases housing, to discriminate based on certain protected characteristics, which include, but are not limited to **race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, age, disability, marital status, lawful source of income or familial status.** Real estate professionals must also comply with all Fair Housing Laws.

**Real estate brokers and real estate salespersons, and their employees and agents violate the Law if they:**

- Discriminate based on any protected characteristic when negotiating a sale, rental or lease, including representing that a property is not available when it is available.
- Negotiate discriminatory terms of sale, rental or lease, such as stating a different price because of race, national origin or other protected characteristic.
- Discriminate based on any protected characteristic because it is the preference of a seller or landlord.
- Discriminate by "steering" which occurs when a real estate professional guides prospective buyers or renters towards or away from certain neighborhoods, locations or buildings, based on any protected characteristic.
- Discriminate by "blockbusting" which occurs when a real estate professional represents that a change has occurred or may occur in future in the composition of a block, neighborhood or area, with respect to any protected characteristics, and that the change will lead to undesirable consequences for that area, such as lower property values, increase in crime, or decline in the quality of schools.
- Discriminate by pressuring a client or employee to violate the Law.
- Express any discrimination because of any protected characteristic by any statement, publication, advertisement, application, inquiry or any Fair Housing Law record.

**YOU HAVE THE RIGHT TO FILE A COMPLAINT**

**If you believe you have been the victim of housing discrimination** you should file a complaint with the New York State Division of Human Rights (DHR). Complaints may be filed by:

- Downloading a complaint form from the DHR website: www.dhr.ny.gov;
- Stop by a DHR office in person, or contact one of the Division's offices, by telephone or by mail, to obtain a complaint form and/or other assistance in filing a complaint. A list of office locations is available online a https://dhr.ny.gov/contact-us, and the Fair Housing HOTLINE at (844)-862-8703.

You may also file a complaint with the NYS Department of State, Division of Licensing Services. Complaints may be filed by:

- Downloading a complaint form from the Department of State's website https://www.dos.ny.gov/licensing/complaint_links.html
- Stop by a Department's office in person, or contact one of the Department's offices, by telephone or by mail, to obtain a complaint form.
- Call the Department at (518) 474-4429.

There is no fee charged to you for these services. It is unlawful for anyone to retaliate against you for filing a complain

NEW YORK STATE OF OPPORTUNITY. | Division of Licensing Services

New York State
Department of State, Division of Licensing Services
(518) 474-4429
www.dos.ny.gov

New York State
Division of Consumer Rights
(888) 392-3644

# New York State Housing and Anti-Discrimination Disclosure Form

For more information on Fair Housing Act rights and responsibilities please visit https://dhr.ny.gov/fairhousing and https://www.dos.ny.gov/licensing/fairhousing.html.

This form was provided to me by Ebenn Maichak (print name of Real Estate Salesperson Broker) of Skinner & Assoc. Realty LLC (print name of Real Estate company, firm or brokerage

(I)(We) Joseph DiMino

(Buyer/Tenant/Seller/Landlord) acknowledge receipt of a copy of this disclosure form:

Buyer/Tenant/Seller/Landlord Signature [signature] Joseph DiMino Date: 09 JUN 2026

Buyer/Tenant/Seller/Landlord Signature ________ Date: ________

Real Estate broker and real estate salespersons are required by New York State law to provide you with this Disclosure